NICHOLAS WOODALL
PO BOX 194
TEMPERANCE MI. 48182
771-241-4590
STEWARTJ4022000@GMAIL.COM

Case: 1:26−cv−00525 JURY DEMAND
Assigned To : Unassigned
Assign. Date : 2/14/2026
Description: Pro Se Gen. Civ. (F−DECK)

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

NICHOLAS WOODALL

V.

DISTRICT OF COLUMBIA; THOMAS HEDGEPETH; ADREN HARRIS; KIA DARBY; WILLA OBEL; HERBERT ROUSON; JANICE STOKES;  ET AL.

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Date 2/14/2025

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

The following is a claim for several counts against DC and the entities and employees of it.

FACTUAL BACKGROUND STARTS ON PAGE 6 AND ENDS at #76 on page 22.

CLAIMS AND COUNTS START ON PAGE ... 32

An Exhibit map listing and exhibits will be filed seperately with the appendix including case citations.

RECEIVED

FEB 14 2026

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

1

JURISDICTION AND VENUE

Jurisdiction

This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the First, Fifth, and Fourteenth Amendments, and the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiff's related District of Columbia tort claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts.

Defendants District of Columbia and its employees acted under color of District of Columbia law at all relevant times. Municipal liability is asserted pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978) as well as single incident theory.

Venue

Venue is proper in the United States District Court for the District of Columbia under 28 U.S.C. § 1391(b) because all events giving rise to this action occurred within the District of Columbia, and all defendants reside in or are employed by the District of Columbia.

Jury Demand

"Plaintiff demands a trial by jury on all issues so triable."

2

PARTIES

Plaintiff is an individual who, at all relevant times, was lawfully present in the Moultrie Courthouse and engaged in protected activity including accessing the courts, petitioning government officials, and engaging in political protest.

Defendant DISTRICT OF COLUMBIA is a municipal entity responsible for courthouse operations, security, employee supervision, access-control systems, surveillance systems, administrative remedy processing, and evidence preservation through its agencies and instrumentalities.

Defendant THOMAS HEDGEPETH was, at all relevant times, courthouse security personnel acting under color of District of Columbia law.

Defendant ADREN HARRIS was, at all relevant times, an attorney or agent of the District of Columbia Office of the General Counsel acting under color of District law.

Defendant KIA DARBY was, at all relevant times, an employee of the Executive Office of the Moultrie Courthouse acting under color of District law.

Defendant EX 1 Unknown was, at all relevant times, an employee of the Executive Office of the Moultrie Courthouse acting under color of District law.

Defendant EX 2 Unknown was, at all relevant times, an employee of the Executive Office of the Moultrie Courthouse acting under color of District law.

Defendant EX 3 Unknown was, at all relevant times, an employee of the Executive Office of the Moultrie Courthouse acting under color of District law.

Defendant MPD OFFICER (Female, Name Unknown) was, at all relevant times, a sworn officer of the Metropolitan Police Department acting under color of District law.

Defendant MPD SUPERVISOR (Name Unknown) was, at all relevant times, a supervisory officer of the Metropolitan Police Department acting under color of District law.

Defendant Unknown attacker was a visitor or employee to or of the courthouse who attacked plaintiff (allegedly)

Defendant WILLA OBEL was, at all relevant times, an employee or assistant within the Chief Judge's Chambers or Executive Office of the Moultrie Courthouse, acting under color of District law.

Defendant HERBERT ROUSON was, at all relevant times, an executive officer of the Moultrie Courthouse with supervisory authority over courthouse staff and administrative procedures.

Defendant PEDRO (last name unknown) was, at all relevant times, an employee or agent of the District of Columbia Office of the General Counsel acting under color of District law.

Defendant JANICE STOKES was, at all relevant times, an employee of the District of Columbia Office of Risk Management acting under color of District law.

Defendant PETER CLARK was, at all relevant times, a supervisor within the District of Columbia Office of Risk Management acting under color of District law.

4

SUMMARY AND INTRODUCTION

Plaintiff brings this action to remedy a series of constitutional violations arising from an assault inside the Moultrie Courthouse and the subsequent refusal of District of Columbia agencies and employees to review, preserve, or disclose critical evidence.

In January 2025, Plaintiff traveled to Washington, D.C. to engage in political protest and petitioning activity, including filing petitions for redress of grievances in federal and D.C. courts and holding a 4x10' banner at US government buildings. On January 16, 2025, Plaintiff entered the Moultrie Courthouse, passed security without issue, and proceeded to the civil filings room. While standing at the payment window, Plaintiff suddenly felt a sharp, localized stabbing sensation to the back of his head. No one in the room reacted, and Plaintiff initially believed the sensation might be benign. Approximately 35 minutes later, Plaintiff experienced significant numbness and realized he may have been assaulted with a toxic substance.

Plaintiff contacted courthouse security and later MPD, but security personnel refused to review surveillance footage, refused to generate an incident report, and directed Plaintiff to MPD. MPD classified the assault as "non-criminal," refused to investigate, and refused to request the footage. Plaintiff then spent months contacting the Office of General Counsel, the Executive Office, the Chief Judge's Chambers, the Attorney General's Office, and the Office of Risk Management, all of whom denied responsibility, misdirected him, or refused to act. No office reviewed or preserved the surveillance footage, and Plaintiff was never able to identify his attacker. The loss of evidence, administrative obstruction, and refusal of multiple agencies to act caused Plaintiff ongoing harm, emotional distress, and the permanent loss of judicial remedies.

Factual background

1.      I traveled to the DC  area on Jan. 14th 2025 for the purpose of holding a sign around the DC area. The White House, One Observatory way, The Capitol Building and The Supreme Court building. to request addressing of several issues myself and other encounter in the state and federal courts.. Issues that reduce ability to litigate, understand the law for personal, business and civic matters, issues where the shield of the laws is narrowed for people of working and lower class and the wealthy or connected have unfair advantages over those who can not assert their rights... instance of library access and inadequate educational materials in the libraries, matters where the rules of procedure prevent poor litigants from using the tools of discovery (such as deposition rules that require a court reporter to be present and take transcripts and the costs related... for instance the cost of court reporters and other deposition costs in this case is likely to cost several to ten thousand dollars) as well as several other systemic issues hindering the working, the elderly, the poor and less educated and capable and their ability to seek correction for injury through the court system (likely the reason the court created the rules, to ease the work load, though I believe the practice at the time, was vagrants and the poor were still treated as less than worthy and the courts did not consider them. While also castrating the mentally unfit).

2.      I also filed two petitions for redress of grievances and contacted the elect providing the case numbers as well as writing the case numbers in on the sign. The purpose of the petitions, to accompany the sign and detail the brief explanations presented and to ensure the info was available to all who sought it in a permanent record. To do this I first visited the Federal courthouse on the 14th and attempted to file a misc. case, the clerks told me I could not and requested I file as a civil case, so the fee was more than the $100 and I filed an

IFP with it and it became [case 1:25-cv-00112], I then went to the Biden White House and stood with the sign for the rest of the 14th and 15th, When the Biden admin gave no response. I went to the Moultrie DC courthouse on the 16th and filed it there; because the docket is public access free without the pacer fees the congress attached in the 80s. (the record of the votes cast seems to not be recorded). The dc superior court case number is [2025-cab-258]. The petitions now, A question of where an Americans fundamental right to free speech use of the courts exists, where it was initially not questioning, but asserting the right and the matter going disputed by the dc sup. court and unresovled and unaddressed until the D.C. fed. appeal [25-5259]. My belief the courts have a duty to docket grievances to the government in the fashion that the kings and royals of Brittan were subject to for hundreds of years. (where the courts in some judges may hold a belief the courts are strictly for matters of determinations of legal matters, the historical practice of petitioning was government action to address matters with law and the foundation of freespeech rights in regards to matters of governance, where the court records were public)

The petition was drafted in the concept of the historical Olive Branch Petition and Magna Carta petitions to parliament and the king. It was intended as a peaceful, formal exercise of my First Amendment right to petition the government absent generic reply (from an unpaid or underpaid college age intern absent real world experience and application of the practice they hold degrees in or commonalities with the working constituent base.) or worse a discarding and stonewalling with the office putting me on a list of people to not reply to. The practice of the first congress was to record all petitions in their annals... and the right so fundamental to free speech that I never considered it would be questioned as a right, where the founders would not have questioned its necessity to facilitate certainty in communications and healthy government.. fee or no fee for filing.).

3. So on the 16th I entered the Moultrie courthouse through the main public entrance.

4. At the security checkpoint, I emptied my pockets as instructed,placed my bag on the X-ray conveyor for inspection. and walked through the metal detector without incident.

5. No security officer raised any concern about me or my belongings. No one at security warned me of any safety issue inside the courthouse, though they did ask about the neoprene bodysuit I was wearing to keep warm in the cold weather.

6. After clearing security, I approached the information desk, asked the staff at the information desk where the civil filings room was located.

7. I was directed to the 5th floor, took the escalator and proceeded to the civil filings level.Upon entering the civil filings room, I observed a woman at the clerk counter behind glass.

8. The clerk at the counter was wearing spandex leggings. I approached the clerk and presented my petition for filing.

9. The clerk accepted the petition without objection and handed me a piece of paper.

10. The clerk directed me to a payment window located to my right. I walked to the payment window as instructed.

11. No staff member was physically present at the payment window when I arrived there. A staffer arrived and accepted my document and left the counter to get a copy,

12. Two people had entered the room who did not seem to be known to each other and were writing and filing papers.

13. While standing at the payment window, I suddenly felt a sharp, stabbing sensation on the top back of my head. The sensation was unexpected and localized. In that moment, I interpreted the sensation as a possible nerve pinch or phantom itch rather than an attack.

14. I am getting older and have had a few injuries that give persistent aches and get the occasional numbness, I hoped this was just an minor neck related issue.

15. Only one of the people was close enough to have attacked before i turned around and the male who was close enough was writing on a piece of paper and I could hear his paper when the attack occurred, making me believe it was not him.

16. I turned around when a woman said something as leaving the room though i did not hear it as I was listening to the writing and wondering in thought about the workings of the courthouse.

17. No one in the room reacted in a way that indicated they had seen an assault. But whatever she said caused the others to look her way, anything less than a gun shot wouldnt have made me think to hear and register what she said.

18. I looked at the male and he gave me a look that suggested he did not know anything unordinary, but the woman had a reasonably fit pair of legs and butt, wearing black spandex leggings and her butt had no sag or uncarried fat in the way she was wearing them. so the look and my looking at her in wonder could have been interpreted in anyway. He did not appear to be aware of witnessing anything he did not expect me to go check for myself, not responding.

19. I noticed that the woman's clothing was similar to the clerk's clothing. I could not determine whether the woman leaving and the clerk were the same person,

when I did look again she was gone.

20.    The female filer was standing in an unusual position, with her feet oriented toward the clerk's window like whatever the believed female attacker shouted startled or alarmed her. The female filer did not appear to be aware that anything had happened but looked in the womans direction due to the volume or content of her statement.

21.    Neither filer offered info or asked if there was any issue. No staff member was present (the woman clerk who I had noticed wearing the spandex as she went to file my document had left to file the females document, Her butt did look similar when she filed my document.

22.    Because no one reacted and the sensation could be interpreted as benign, I did not immediately understand that I had been attacked though thought there was a very narrow chance, but she was gone and my experience with courthouse criminals is an immediate discard of the weapon. I waited back at the payment window for the male clerk to return with my payment paperwork and left the courthouse without reporting the sensation to anyone at that time.

23.    At the time I left, I still thought it extremely unlikely I had been stabbed or otherwise assaulted. Approximately 35 minutes after the attack, While driving, I began to experience numbness. While deciding to head to One Observatory way tke an in for Kamala if the White house had not notified her of the 10w' by 4h' sign or back to the White House and since this was not my first toxic substance encounter I was now waiting to determine if I needed to call security to review the cameras and if I would need to go to the hospital.

24.    The heavy onset of numbness caused me to realize that something could be seriously wrong. I decided that I needed to contact courthouse security to request a review of the

surveillance footage. Now cer tain I had been battered and with a toxic substance that produced a sore spot. While I determined if the toxin was going to get worse (From conversations with doctors and nurses I knew the hospital would usually prescribe a barbiturate for poisions and an iv of magnesium, but not knowing what the toxin was I decided to give it an hour while i called security) I called courthouse security and spoke with an unidentified security guard.

25.     I informed the guard I had been injured in the courthouse and symptoms were presenting. I requested that the security guard review the surveillance footage. The security guard told me he could not review the footage.( I am unsure if this was a true statement).

26.     He did provide the Head of Security Thomas Hedgepeths number and I contacted Hedgepeth by phone. Hedgepeth informed me he would not review the footage, I was too intoxicated from the poison to argue the merits and the conversation then became how do I identify and hold the attacker accountable, So i asked and was informed that the MPD could get the footage by investigation and the Office of general counsel could accept preservation.

27.     To my knowledge Hedgepeth did not review the surveillance footage, nor take steps to preserve the footage. Nor initiate any internal process in response to my report.

28.     After receiving no action from security or Hedgepeth, I went to recuperated and hydrate for about an hour while I determined if the symptoms would get worse or if they had plateaued, but cant remeber where I decided to hold the sign. (the intoxication was not more sever than a concussion and was also mildy euphoric like a synthetic opioid so i felt confident that I would not immediately fall over dead.. Where the substances were not something as severe as abrin, ricin, or anthrax in a deadly dose or a dose that I had not already absorbed in its full measure of the micro needle piercing my skin, though I was

not sure.) I recovered from the initial intoxication and from the 16th to the 26th I spent at least 4-8 hours or more (far less than I had intended to do of 10 to 16hrs, The cold not an issue wearing the neoprene and having no aversion to below freezing temperatures, only the residual aches, cramps and disorientations and numbness bothered me.) standing in front of the white house, one obs.. way and the supreme court. Capitol security denied me the right to hold the sign at the capitol building on the lawn between the capitol and the supreme court building and on the day of the inaguration near the Capitol one area...

29.    There was only two issue absent the denial by the capitol police at the capitol building and the supreme court security telling me I could not hold the sign on the outer ring public side walk of the court..

30.    When I was standing near the Capitol arena a line of New York police officers were taunting me with some of them yelling "fuck you nick".

31.    And an instant where I believe a person exiting the white house or a Secret service member let loose an intoxicating gas or again pricked me as they walked by me, but I could not tell if the residual symptoms from the 16th   were the cause of the white house intoxication.

32.    So after no response from any elect and the secret service asking some rather less than intuitive and undereducated questions about the issues that made me question the presidential use of the secret service. I had to get back home, I called the MPD since Courthouse security had repeatedly refused to review. MPD said they could not take a report over the phone and I decided not to have them come to me at the white house.

33.    I went to the MPD and spoke with a female enforcer. I informed her that I had been assaulted inside the courthouse, that I needed the surveillance footage reviewed.

34.    That courthouse security had refused to review the footage and the symptoms following the incident.

35.    I informed her I did not seek medical attention because of the priority of activism (if I was going to die or need medical attention I was going to do or need it as part of a secret service report on the front lawn of an executive residence).

36.    She filed the complaint as non criminal (but did not inform me of this and told me investigators would contact me.) even though she said the attack was not unusual for DC and knew that the complaint would not be investigated because of the non criminal disposition.

37.    I then drove out of DC. back to my state of residence arriving on the 27th.

38.    When I had not been contacted by MPD on a follow up, I contacted mpd and talked with an investigator who said he could not investigate because it was not a crime and he could not request the surveillance footage from the courthouse. I asked who could change the classification and he said the intakeing officer,

39.    I then contacted her by phone and she refused to make the change and avoided and hung up when confronted. When I called back I could not get ahold of her and was transfered to her vm, I left messages she did not return.

40.    So I then contacted her supervisor who also refused to change the classification or order the investigation and he ended email conversations when I questioned her mental faculties.  He refused to explain why the report was classified as a non criminal report and why he would not reclassify it, refusing to allow me to supplement the information. This was the end of attempts to contact the MPD about the issue, only requesting a complaint taker contact from MPD at a later date...

41.    The MPD refused to take a complaint over the phone. The MPD did not request that the courthouse preserve the footage. The MPD officer did not contact courthouse security. The MPD officer did not request the surveillance footage. MPD ultimately classified the matter as a non-criminal report. MPD did not open a criminal

investigation. MPD did not follow up with me after the initial contact. Nor would MPD explain why it was classified as a non criminal complaint to allow additional info. MPD has an alleged practice of downgrading criminal complaints: Charlotte Djossou v. District of Columbia Case No. 2020 CA 004292 B  D.C. Superior Court (Civil Division) (although I can not find the case in the superior court docket I have placed info in the footnotes of a House investigation+).

42.     I then continued my preservation attempts with the courthouse I contacted the courthouse and after several attempts to find the legal department and less than helpfull staffers redirections I obtained a number for the Office of General Counsel (OGC).

43.     I contacted the OGC by phone and received an email address, [EXHIBIT] and emailed a notice to preserve, the email was replied to by OGC staff member Adren Harris.[exhibits] In several emails and a phone call request, where Harris called me from his cell phone(believed to be done to circumvent the recording of the call in the dc legal departments standard procedures (I think that all calls to the OGC are recorded and kept for at least a year and have been requested preserved by notice). Harris again in the call did as he did in the emails and reiterated that he would only order the preservation if a valid subpoena was submitted [exhibits] (directed to the security office).

44.     I provided Harris in the emails[exhibits]the relevant case law regarding the duty to preserve for the District of Columbia fed. and superior circuit and the rules for both courts .

45.     But Harris persisted to play the fool, stating he already told me what was required[exhibits] and ignored the clear notice of duty to preserve for litigation

https://legalinsurrection.com/2025/08/dc-quietly-settles-lawsuit-with-sergeant-who-exposed-crime-stat-manipulation/
following is a story with pages of the docket https://freebeacon.com/crime/a-dc-police-sergeant-exposed-her-superiors-for-misclassifying-crimes-to-make-stats-look-low-the-city-just-quietly-settled-her-lawsuit/
A US House investigation of multiple districts of the MPD, But alleging a single whistle blower, possibly Charlotte: https://oversight.house.gov/wp-content/uploads/2025/08/MPD-Crime-Statistics-Manipulation-Doc-Request-and-TI-Request.pdf      (sorry for no perma links)

anticipated [exhibits]. The notice to preserve informed Harris that I had been assaulted inside the courthouse, that MPD should be contacting the courthouse, and that I intended to pursue civil litigation and needed the footage preserved.

46.     Harris did not accept responsibility for addressing the issue. To the best of my knowledge Harris did not initiate a review of the footage, did not initiate preservation of the footage. Did not initiate any internal investigation. The last email exhibit I received from Harris was the last time he contacted me, He never confirmed preservation.

47.     So I contacted the court again and spoke to several operators who were less than helpful with several redirects and hangups before i found the executive office was incharge of the security and ogc, and called.
At the Executive Office, I spoke with Kia Darby. I informed Darby I had been assaulted inside the courthouse. Security (hedgepeth) had refused to review the footage.
That OGC (Harris) had refused to act to preserve and I needed preservation before the 14th of Feb..

48.     Darby confirmed the office was incharge of the security and OGC and provided an email address; To provide the complaint and the preservation request that I asked to be confirmed, [exhibits]

49.     Instead of following with the urgency of the preservation, darby simply replied and said the matter has been forwarded to the appropriate executive department staff. I never received any reply back from the executive office or Darby to confirm the preservation or notify of the complaints outcomes.
When darby's reply of the [exhibit] (stating the matter was forwarded) was received, I called the executive office and spoke to two or more different female staffers, they hungup repeatedly and stated Darby was out and could not confirm preservation had

occurred. But said they had someone who could help and transfered me to Willa Obel of the Chief Judges office.

50.    I told Obel I needed immediate preservation, stated the same issues I told Darby and that the executive office said she could help. She provided me her email and I sent her an email stating the urgency [exhibits] she simply replied to say [exhibit] that she forwarded the request to Hedgepeth and Harris and ignored that they had been stated in the email as having taken no action and, I needed to ensure a reliable party performed the preservation.

51.    She never replied back.

52.    After these occurrences I made further requests for information regarding the courthouse practice of obtaining footage of video recordings of judicial hearings, after the judge who was assigned to the petition (which may or may not have been filed as miscellaneous as requested) behaved in a way that I perceive was improper. The requests for info about judicial hearings were not replied to either.

53.    After receiving no effective action from security, Hedgepeth, OGC, or the Executive Office, or chief judges office; having made phone calls, vms and emails still having no reply to confirm preservation or obtain details of my complaints. I then came to believe in mid to late februrary of 2025 that the preservation had not occurred and the Moultrie courthouse had a serious staff and employee problem and was avoiding me with the intent to avoid accountability and responsibility for the actions of their employees (and if the attacker was an employee or not, their actions seem to suggest they conspired to destroy the evidence and hide the crime. Though this is not currently being pursued.).

54.     So I called the executive office and spoke with a David Friendly and said I needed to know who accepts administrative claims for the courthouse (I was unsure of the language used by DC law regarding who accepts and unclear about what entity the moultrie courthouse was a member of  "independent federal" or "DC District" or if US Marshalls worked security beyond the supervision of the courthouse executive office  (that could have been a possible reason for delayed reply, not a good one.. but possible).

55.     I was informed by David of his uncertain beliefs about procedure and asked he get confirmation from a supervisor or Herbert Rouson the executive officer of the courthouse.

56.     David informed me he was told the executive office accepts the administrative remedy claims and a claim was mailed to the executive office. Several weeks went by and after some investigation I found a belief the Mayors office also required a copy in the event the courthouse was not a federal entity (which David could not confirm).

57.     So I contacted the executive office again and again spoke to David using an alias claiming to be an attorneys assistant from out of district and asked David to confirm who accepts administrative remedy on behalf of the courthouse for negligent acts related to property management, slip and falls and other general tort matters. David was unsure and we talked to try and determine if the court was an entity of the federal or dc... (its unknown of if he was honest or being deceptive) but i did get him to go ask Herbert Rouson and he contacted me back

58.     [David said: "He said something different, he said to ask the office of general counsel" referring to Herbert Rouson's statement].

59. So I contacted OGC again and I spoke with a woman whos name i cant recall and a person named Pedro on a recorded call [exhibit to be submitted as a you tube video and submitted with other audios of calls upon court approval or preferably in discovery]

60. I was informed that the attorney generals office accepts administrative remedy for the courthouse (only "attorney general" was said, but a contact address was given and it was the D.C. local attorney general, not the federal A.G.)

61. Then I contacted the Attorney General's office. At the Attorney General's office, I spoke with an unknown operator employee. The A.G. office had a civil department but I kept getting transferring to the child support division and I was told by them that the A.G. does not accept tort admin remedies, and the phone operators could not transfer me or give me the direct line, the number kept going back to child support... but I obtained their address for the civil department in the event they were improperly informing me and sent an admin claim to the A.G.

62. The A.G. did say that ORM (Office of Risk Managment, a part of the mayors office) handles admin remedies. So I also sent an admin remedy to them by submitting it on their website. The claim was denied in several weeks, a statement simply of the law [exhibits to be submitted] emboldened saying the claim was untimely.

63. But no reason of specificity, so believing they possibly interpreted the date of occurrence wrong I contacted them by filing another claim, it was labeled as a duplicate (I was informed of this by email) despite a written notice stating it was to correct any confusion or deficiency in the previous claim which was also included.

64. I received no reply to the contact attempts, So i contacted the ORM by phone and spoke to a Janice Stokes, who told me several lies (youtube/exhibits or/and to be submitted on request) or what I believe and allege are lies and contradictions.. Where she stated that the ORM does not handle admin remedy claims for the courthouse and refused to review the

claim.

65.    She said she would provide me a statement in email saying the ORM did not handle the courthouses claims and when I asked Janice about why the previous employee did not give a reason for the previous denial, she said they did but i explained it was not detailed. We talked for about 20 to 30 minutes and she made several attempts to confuse me and steer the conversation. She asked how I knew the footage was destroyed and I said I did not. I asked if she could direct me to the documentation that said the ORM does not handle courthouse admin claims and she said she could not provide it. I did get her to agree to send me an email statement that the ORM does not handle courthouse claims and what Janice professed was a detailed explanation of the initial dismissal, Which she had debated had more information than the initial dismissal I read her [exhibits] (though she could not detail it over the phone because she claimed to be out of the office)

66.    She then emailed me a copy of the denial letter [exhibits], She did not email me the promised statement the ORM does not handle courthouse admin claims and the copy of the denial letter she sent me was the same denial letter I had discussed with her (absent any specifics for the denial).

67.    So i contacted her supervisor Peter Clark and stated in email as well as calls[exhibits] to which i have received no reply. That I was unsure of the practice of ORM and Janices assertions.

68.    In addition to these named contacts at these several DC entities and offices, I spoke with multiple phone operators across the various offices I contacted. Some phone operators transferred me to offices that later denied having authority to address the situation. Some phone operators transferred me to voicemail boxes where my calls were not returned. None of the operators were properly trained to route calls to anyone who

69.     could answer the questions I had and required several hours of discussion. All These transfers and misdirections contributed to an administrative loop in which I was repeatedly redirected without any office accepting responsibility for the admin remedies[exhibits to be filed].

70.     Across all of these contacts—security, Hedgepeth, OGC (Adren Harris), the Executive Office (Kia Darby and Will Obel), the Attorney General's office (Pedro), ORM (Janice Stokes and Peter), phone operators, and MPD—no one took responsibility for reviewing or preserving the courthouse surveillance footage. Each office either refused to act, denied responsibility, redirected me elsewhere, gave a false statement or incorrect answer or failed to respond.

No office or individual confirmed that any surveillance footage had been reviewed. No office or individual confirmed that any surveillance footage had been preserved. No office or individual initiated an internal investigation into the incident. No ORM's generic paste reply was provided to me with written confirmation of action taken.

71.     As a result of the failure to review or preserve the footage, I was unable to identify the person who attacked me. Because I could not identify the attacker, I could not provide video-based identifying information to MPD.

72.     MPD's classification of the matter as non-criminal was made without the benefit of any video evidence or statement from the courthouse security and directly contributed to the MPD's ability to classify the attack as not a crime, had the courthouse security reviewed the footage and identified the attacker, The police report would have possibly been documented as a crime and this case would likely not be pursued.

73.     I still dont know the identity of my attacker. Whether the attack was random

or targeted. Whether the attacker acted alone. Whether the attacker was connected to any group, including any criminal organization or any "back the blue" or unmonitored and corrupt, blindly serving oppressive portion of the legal community. Where the several defendants (and to be added defendants) all acted in step with the courthouse security refusal to review and took que to continue the deprivation by aiding and abetting the acts of their law enforcement fellow (where its possible the attacker was a member of the courthouse). Or they are all a combination of lazy dishonest and selfish. Whatever it is, their actions are a disgracefull exertion of the lack of transparency, willingness and ability of the government to correct itself across agencies.

74.     As of current I am still unsure of the existence of the video footage, where in [DC sup. case 2025-CAB-004829] Adren Harris representing the Moultrie courthouse has used the dishonest practice of lawyers who speak evasively to delay and avoid accountability, in his motion to quash my subpoena the court initially ordered... The quash was denied (where Harris did not attend the quash hearing and failed in other civil procedures), although the judge seemed frustrated with me for some reason where I have given no reason of improperness to the courts, I know of, and where the judge also stated at the mention of and not even being provided a motion for sanctions, that she would likely deny it and dismiss the case. But this could be construed in numerous ways.... As of 2/12/2026 the last date to produce the footage requested preserved and one of the major factors in this case. Harris has failed to return contact attempts of calls and emails and failed to produce. I am now drafting motions to compel, sanctions and inferences for the claim. Where it seems clear to me that the tactic is clear bad faith, delay and litigation frustration.

75.     I still dont know whether the attacker had prior knowledge about me.

Whether I faces an ongoing risk of being attacked again when I return to Washington, D.C., or even at home. I have spent approximately a year engaged in repeated contacts with multiple offices and individuals in an effort to obtain review, preservation and production of the footage and to obtain any form of administrative remedy and judicial or court remedy for the injury and the deprivations.

This process required me to draft multiple documents, send mailings, and repeatedly follow up with offices that either did not respond or refused to act.

76. The administrative runaround consumed significant time and attention that I would otherwise have devoted to my petitioning activities (such as calling and mailing US Congressional offices about the matters of the DC Fed. Appeal Case and other matters of civic duties and goals of personal and community nature. Over this period, I have experienced sustained anger and disgust toward the legal community. My respect for the lower courts of D.C. and the greater D.C. legal community has been severely damaged by what I perceive as their refusal to accept accountability or act with integrity and show good character. I have spent unknown hours in anger and worry about my health following the incident. I now experience a vision problem in one eye, to which I hope is neither old age or a result of the attack, but is likely a matter   contributed by both. The combined effect of the physical incident, the loss of evidence, the administrative obstruction, and the inability to identify the attacker has caused me ongoing emotional distress, uncertainty, and a sense of unresolved threat only furthered by the time spent researching drafting and begrudgingly pursuing these claims. (Where this is arguably a case where a pro se should be compensated for their legal work in pursuit of their claims and to the benifit it produces for the community. Though precedent currently deprives this.)

77.     The following is offered to dispel any questions the judge may have about the likelihood of my claims in the event I missunderstand the plausibility context requirement of IFP claim requirements and to attempt to dispel any judicial beliefs the claims of injury or intent of the defendants is exaggerated or without reasoning... to avoid a dismissal on lack of merit and believability of the claims and the amount. If the court find its satisfied with the claims and possesses no reason to deny IFP status or wishes to request discovery materials I would rather retain until discovery if the defendants dont settle. Then you may save yourself a few minutes and proceed to the counts section  p 32. As the following is background relevant to me and a small instance of my unusual life occurrences with corrupt law enforcement. A mix o nessessary staements in the event the defendants refusal to aid in identification of my attacker leads to my death and validation that what is plausable for most is not uncommon for me, So the following is offered.]

My proffessings of the percieved corrupt law enforcement actors as part of a greater issue and their acts as unison (though conspiracy is not currently sought) and I am not able to fully articulate the specifics at the current time, is held because of prior experiences with corrupt law enforcers and their partners, their behaviors and practices in speech starting with [az case 2:21-000962] A case stemming from when I worked for small (20-30 people nation wide) organized criminal organization (alleged). Who makes business deals with law enforcement organizations across the nation and then frauds the communities out of charity donation raised (stating the program is 100% local, but we were calling out of Arizona and saying %100 percent goes to the kids, but the organization was keeping 80 - 90% in more than 5 states and 10 cities actively, several million a year but a large portion in costs[x].) They were/are doing this by proffessing the donations fund a

x: The following news story is provided later to valid the factual allegations of unlawful conduct by law enforcers across the nation or at-least create plausibility, it can be followed and searched to find the end result which is a civil "conviction" after a failed criminal investigation against several L.E.O. member heads, but not for stealing the communities charity donations, for stealing the other cops pension funds  [ https://www.kmbc.com/article/whistleblower-reveals-script-used-for-fundraising-for-overland-park-police-foundation/45197610?utm_source=copilot.com]     (sorry for not providing perma links.) heres the pension fund story [ https://www.kctv5.com/2025/05/08/former-officers-ordered-repay-275k-close-misused-charity-funds-scandal/ ]

shop with a cop program: cops take kids shopping and get kids school supply and Christmas gifts.

The companies phone room employees (myself included for a time) pose(d) as law enforcers of the organization they are raising funds for and when I went for the interview I was finishing a 10yr probation sentence for intent to distribute narcotics and possession of a firearm while in commission of a felony and atleast two of the employees knew and witnessed me selling drugs, and on drugs on multiple occasions in the neighborhood the office was located in (prior to the sentencing). The office stayed intoxicated and so did 2 of the 3 bosses, while my drug use was encouraged and attempts to purchase made both in direct and conveyances... Upon completion of probation I began following the scripts and rebuttals and collected audio and document evidence of a practice of criminality by 2 of 3 bosses and more than 5 employees provided and attempted to reprovide the info to and attempted to get the FBI to investigate in several attempts .. The company had been exposed in several communities as dishonest and misrepresenting (although the news had fell far short of exposing specifics and never pursued any public action, just a bit of sensation) and since the FBI took no action to stop this multi million per year fraud. In 2021 (5yrs later) I arrived at PHX FBI with a sign; To find law enforcers who felt duty to country beyond a pay check (I found nune). Phoenix PD showed up at the request of a vague 911 call (likely a disgruntled FBI agent, their avoidance and frustration very clear by response.) and (allegedly) illegally detained me; while clearly failing to follow the legal detainment procedures.. it should be noted that PPD is believed to be an associate of the company by way of its F.O.P.,A former client of the company (one of several of the Arizona Fraternal law organizations to fraud their communities by telling the concerned public who called them it was the Fraternity raising funds (alleged) although in my recordings with the communities

and law enforcement agencies I contacted when doing my own investigations, the way communications are conveyed thru supervisory trickle down and up, The police and sheriff enforcers I spoke to made it seem these people were law enforcers, even though when reminded in several audio recordings they corrected to state it was a private company, clear accomplices and a showing of how a conveyance of info to a subordinate can result in the easiest problem resolution sought even if it was not technically legal. Or they were blindly following in idiocy and convieniency without consideration or worry for the results and no fear of repercussions.

In 2021 or 2022 While standing infront of the American Legions hall (Pat Tillman post in paradise valley) Holding a 4x8' sign (stating issues of childrens charity funds being stolen) for the Rock Church (Alice Cooper) during a band competition,Veterans of the hall came out and started cussing at me and intimidating me telling me they would have me trespassed from the public property I was on. (the same practice PPD used at FBI). I clearly staed the obvious property lines and they ignored, these vetrans like most government officials held a belief that their service to country granted them entitlements to oppress or alter the rights they signed up and got paid to protect, as some sort of lenience in abscents of accountability.

I later brought suit in small claims court, when the audio was played the defendants were clearly guilty of negligence and assault. The judge asked the defendants why they should not be found guilty and the operator of the Legion Hall said they were a veterans association and needed the funds for the veterans (placing themselves in a class above the American people) A clear instance of a problem in this nation where subordinates and servants find it easier to do their job as the see fit and not in the order the people law prescribes. The judge ruled in their favor in an obscene showing of bias and judicial fault where the judge ignored and refused to allow me to

state where they ignored the element was met, threatening me with contempt. But in Arizona small claims a person does not have a right to appeal, the plaintiffs and defendants waive that right, so no appeal could be made.

In seeking resolution and correction of the charity theft I also contacted my local community though they were unwilling or unable to help in any substantial ways, Passing out aprox. 10k flyers and reaching out to community groups. I contacted churches in the several communities effected with rare reply and no help. I contacted approximately 35 of the largest churches in the greater Phoenix area; churches who build plumbing and buildings in nations not our own, but refuse to assist in capturing a stray bull, while refusing to profess a set of laws and punishment they practice among themselves or worse petitioning to impose their religions laws on the nation in disregard... Cop watchers gave little help in exposing the issue and did not persist for long. BLM told me they only help Blacks, La Raza prioritized hispanic issues, while also declining to assist with brining up language translations of the law that were sought in Arizona in the early 2000's.

People arent out in the streets screaming fuck the police because they got caught with a bag, some of em ya, but theres plenty juice box stories and property damages, refusals to aid "some" members of the public, failed investigations, rookies and intentional fingerprint smudgers, stories just like mine where repeatedly members of the legal and law enforcement community make errors in their work and instead of saying oops im sorry I cant afford to pay you now, like a respectable person would and give them a number to work out a payment agreement, they and the law simply practice the same entitlement the veterans did, Their serving so their not accountable and dont follow proper etiquette...

What I have found is the American peoples and entities seek the path most beneficial to them in a large majority and decline to define or present foundational principles. Theses members of the D.C. law community are no different choosing their community and I realize these opinions are likely unfavorable for pleadings to the court but they are background context that possibly saw me driving into DC, or they were as ignorant as using the wrong phrase on the wrong side of town or looking at a cop for too long, or professing the courts treat the poor like the vagrants of the past. (theres a reason the legal or government workers rufuse to treat me as though its an honor serve and the name must have got to them before I ever met them and it may help in proving any future conspiracy claims by airing this out on the docket, it will not happen again, I swear.)

So continuing, the elect were no help with the kids charity money either (between asks for language translations as principle' and introducions to understanding law as classes, I have talked with over a hundred of the hills offices). I have found the US elect and government offices hate to be wrong even in the most minor of matters and showing their faults has or does not aid in correcting the issues the people are facing, nor resolve the matters. The American people even though we posses and live in a democratic republic, submit to an unreasonable amount of deprivations and criminal acts for our form of government, while also shying from holding our elect accountable even in little matters. They are either quiet perverse and tactically communicative between themselves with a tight grip on power or very narrow minded in their closed circles and unreceptive of the broadness of the American peoples comprising the "majority". Our two party system has made is self a shield of conflict, Where the parties for as long as I can remember have placed themselves in narrow likelihood of success, so calling out or demanding correction

of our US elect, becomes a fight amongst ourselves, where "the party might fail" in its goals in events of a seat being rerun.

All the while everyone has an opinion and an assertion but its rare to find data research and reasonings or solutions.

As said I also contacted several US congressional elect offices in my searches to help the kids; where all but a staffer of David Sweikert, were generally unhelpfull ranging from being happy to say "dont help"; an Idaho congressional staffer said "these types of things dont get solved" when asking about a resolution and no congressional offices constituent services was willing to consider a congressional inquiry of the FBI (DOJ) or even to facilitate back and forth communication to determine if any further info could be provided, where the FBI never contacted me!

The courts are the only place to make correction of these types of injuries in our nation where the FBI and federal agencies refuse to disclose the tips they dont pursue or the complaints made and are reluctant to be direct and hold their community accountable. The statement by the Trump DOJ in regards to the blanket dismissal of the investigations of law enforcement agencies across the nation is a clear example, although in my opinio, experiences and review, racism is not systemic but localized and oppression in assertion of power for opportunity and comfort is the prevalent factor, where it was the poor and uneducated being oppresed and treated with less regards to their rights, not dissimilar to the situation here. Back to the kids...

I contacted several local and national news agencies and found they all give a generic reply of "They.. will call you if their interested". Several months after handing out flyers at the 2023 Super Bowl in PHX,  I was able to get news coverage of the story, though it was unsupported by the employees of the station and community to result in a noticeable amount of traffic to the site detailing and showing the evidence I presented and creating any result for the other communities of the nation that are being effected. I can attribute this to the production team who were less organized in their questions than I expected, denied me a chance to see the questions of the interview to give prepaired responses and "cropped in" my zoom meeting to cut the website name out of the shot by closing up on on me, cutting the meet for time and not offering the the meeting in full. While also breaking their verbal promise to mention the site and state I was seeking assistance in finding resolution.

They later edited the story and did a restory but this was after the initial run and I got the same amount of traffic to the site as I did when handing out a thousand fliers (a few hundred hits that diminished in retention) The story can be found at footnote. (to validate or create plausability in my professings of dishonest heads of L.E.O.'s in association with this company). The details are these where their story's are time consuming...

[ https://www.kmbc.com/article/whistleblower-reveals-script-used-for-fundraising-for-overland-park-police-foundation/45197610?utm_source=copilot.com]     [ https://www.kctv5.com/2025/05/08/former-officers-ordered-repay-275k-close-misused-charity-funds-scandal/ ]    sorry for not providing perma link$

When the company was mentioned after several heads of (a Kansas City Mo. suburb) overland park F.O.P. were accused of illegal appropriation of pension funds for personal use, later found civilly liable for taking funds of the law enforcers under them.

An investigation was performed not for theft of the several hundreds of thousands in charity theft of the communities donors, but for a theft of other law enforcers pension funds (i believe misappropriation is the term (27k) and the investigators never reached out to me despite me having provided them information and the website link which hosts numerous audios and documents from other states and one form their local police lying...  So I am coming to question if the law enforcement community only serves itself and its own intrests, it would appear in that instance they did where they got their money got off the clock and did nothing more. I continuously encounter dishonesty and deception, corruption, lack of accountability and integrity. I find Commitment to service to country and community is as prevalent in the law enforcement community as it is in common American society, where personal bonds are often valued above or in conflict with law, principle and; good character as a constant is a rare thing. Where just as illegality is common in the public (15-25% of the public have a felony or miss. conviction, though I cant cite you the research and data), but if law enforcement stats on arrests for crimes and conviction rates are considered with crimes that dont get reported, actual criminal actors in the nation is probably much higher and more seated than is ever admitted.) it is also common in law enforcement and legal communities, just less pronounced (but not unsimilarly prevalent) where the incentives to adhear to the law are tied to self

30

sustainability. Law enforcers and legal community servants who dont hold their own accountable create a dishonest inoperable legal system and for themselves an opportunity to make a quid pro-quo criminal network in usurpation of the law and this is I believe the situation of this case. Where the defendants piled up (and this is not an exhaustive list of defendants or actions its just what I could get filed  now.) in refusal to hold their coworkers accountable[x]. Where they likely fear they will not have dependability or trust and have exposed their families and personal lives to these people and those next to them, but the reasoning is flawed.

So I am asking the courts to deal swiftly in these matters and leniently with me as a pro-se litigant who has not retained or obtained and practiced a full understanding of the practice of civil law. And harshly with all defendants in the event of guilt, where the likelihood they will receive actual repercussions of firings and accountability in costs (where simple laziness and poor character may be protected by indemnification clauses, (not that they should not exist, but I dont believe the system has addressed accountability or made a forum[x] that that allows anonymous members of the community to offer solutions and experiences)..

To anyone who has read this I am seeking legal aid in a contingency or probono request, and will request counsel covers the costs of discovery if you can not settle this case before then.

x. The petitions also request research in to the possibilities of requiring insurance for law enforcers. It also asks research to determine if its possible to create an anonymous public forum online for the purposes I have purposed the courts docket... Though I am told by people who lack the logistical thinking and perspectives of character, ethics and experiences I tend to assume in my assertions as obvious perceptions, that the petitions requests are not detailed enough, I dont disagree, but I believed the electorate (even their staff) would possess the experience of age or reasoning to recognize and acknowledge the matters (and value of recognition for civic participation or perceived duty, even and especially when they only agree on the matter at hand.) as known problems and the value of a good forum or device to serve the countries needs.

BEGINING OF COUNTS AND CLAIMS

All counts should be treated as incorporating the factual background and preceding and descending claims where relevant.

COUNT 1 – §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMENDS. I & V)(COURTHOUSE ENTITIES)

Against: District of Columbia (Courthouse / Court Security / OGC / Executive Office)

Theory: Monell – failure to train and supervise resulting in evidence loss

Elements and Application

Element 1 – Nonfrivolous underlying claim

Plaintiff was physically attacked inside the Moultrie Courthouse, giving rise to viable civil and criminal claims (¶12–22).

Element 2 – Official acts obstructing access to the courts

Courthouse security (Hedgepeth) refused to review footage or generate an incident report; OGC and Executive Office staff refused to ensure preservation or act on complaints despite notice of anticipated litigation (¶25–27; ¶42–53).

Element 3 – Municipal policy, custom, or failure (Monell)

Courthouse entities lacked training and supervisory procedures requiring (a) incident documentation and (b) litigation holds upon notice, and no mechanism existed to ensure compliance or escalation, if supervisory procedures existed they refused to follow them. (¶26; ¶46–53).

Element 4 – Causation and actual injury

Because no report or preservation directive issued, surveillance footage was lost, permanently foreclosing identification of the assailant and Plaintiff's ability to pursue remedies (¶71–75).

COUNT 2 – §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. I; V)

Against: District of Columbia (MPD) Theories: (1) Monell custom/practice; (2) Single-incident liability (alternative)

Elements and Application

Element 1 – Protected interest / nonfrivolous claim

Plaintiff reported a physical assault inside a government courthouse, implicating criminal law enforcement and civil tort remedies (¶33–35).

Element 2 – Official acts obstructing access

The responding MPD officer classified the assault as "non-criminal," and the supervising officer refused to correct, explain, or permit remediation of that classification (¶36–41).

Element 3(a) – Municipal custom or practice

MPD maintains a documented practice of downgrading assaults and other crimes, resulting in non-investigation and loss of remedies, as alleged in Charlotte Djossou v. District of Columbia, 2020 CA 004292 B (¶37–41).

Element 3(b) – Single-incident liability (alternative)

Even absent a longstanding custom, the obvious need for supervisory correction and classification training made the failure to intervene in this single incident a predictable cause of constitutional injury (¶36–41).

Element 4 – Causation and injury

The non-criminal classification foreclosed investigation, evidence development, and prosecutorial and judicial review, impairing Plaintiff's access to the courts (¶71–75).

COUNT 3 – §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. V)

§ 1983 MONELL: FAILURE TO SUPERVISE EVIDENCE PRESERVATION (COURTHOUSE ENTITIES)

Against: District of Columbia (Courthouse /Chief Judges chambers assistant Willa Obel(["special" relationship; undertaking] to act in a minesterial duty of authority)/ Executive Office / OGC)

Elements and Application

Element 1 – Constitutional deprivation

Plaintiff's right of access to the courts has been impaired (and possibly has been/will be precluded and/or totally prevented) by the withholding and loss of surveillance footage documenting an attack (¶71–75).

Element 2 – Failure to supervise despite notice

Executive Office personnel (including Kia Darby and 3 unknown staffers) and Chief Juges Chambers assistant Willa Obel (who created a special relationship/ undertaking by accepting and agreeing to help ensure preservation when two of the unknown staffers

repeatedly hung up on plaintiff and one told plaintiff, who informed them of failure to urgently act by Kia Darby and the Executive Office unknown staffer to respond or order preservation immediately and plaintiff was then informed he would be transfered to someone who could help; then being transfered to Obel who then created the special relationship/ by being informed of this and agreeing to help), these parties were notified that:

-Hedgepeth refused to review footage or create an incident report (¶25–27);

-Adren Harris denied that preservation duties are triggered by foreseeable litigation and insisted only a subpoena would suffice (¶42–45);

-Surveillance footage faced imminent deletion (¶71–74).

-Despite this notice, Executive Office personnel (and Willa Obel "who may have sought a judicial need" if not being nosey, creating a special relationship/ undertaking) failed to supervise, override, or escalate preservation, even though such intervention was plainly required (¶46–53).

-Willa Obel of the Chief Judges Chambers knowing of the imminence failed to fulfill agreements or reply back.

Element 3 – Deliberate indifference

The need for immediate supervisory intervention was obvious where time-limited evidence existed and subordinate employees disclaimed preservation duties and urgency was repeatedly expressly stated in multiple verbal and email communications to these several employees (¶26; ¶42–53).

Element 4 – Causation

Because supervisory personnel failed to act, no litigation hold issued and the footage was destroyed (¶71–75).

COUNT 4 – § 1983 MONELL: CUSTOM OR SINGLE-INCIDENT PRACTICE OF IGNORING COMPLAINTS (EXECUTIVE OFFICE) §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. V)

Against: District of Columbia (Executive Office of the Courts)

Elements and Application

Element 1 – Official practice or single-incident failure

Executive Office staff repeatedly ignored, terminated, or deflected Plaintiff's complaints without docketing or response, including hanging up and transferring calls without action (¶46–51).

Element 2 – Deliberate indifference

A practice of ignoring complaints predictably results in non-documentation, deletion of communications, and preclusion of downstream remedies such as negligent retention or discipline (¶46–53).

37

Element 3 – Causation

Because complaints were not recorded or acted upon, no investigation or corrective action occurred, directly contributing to evidence loss and denial of remedies (¶71–75).

Theory clarification:

This count is not mere alternative pleading. It alleges a self-precluding custom where complaints are ignored in a manner that prevents any record from existing.

COUNT 5 – § 1983 MONELL: FAILURE TO TRAIN AND SUPERVISE ADMINISTRATIVE CLAIM INTAKE (COURTHOUSE) §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND.I; V)

Against: District of Columbia (Courthouse / OGC / Executive Office)

Elements and Application

Element 1 – Inadequate training

Courthouse staff provided inconsistent and incorrect information regarding who accepts administrative tort claims for courthouse misconduct (¶54–60).

Element 2 – Deliberate indifference

The risk that misrouting claims would cause forfeiture of statutory remedies is obvious (¶59–60).

Element 3 – Causation

Plaintiff was delayed and misdirected while limitations periods continued to run (¶61–67).

COUNT 6 – § 1983 MONELL: FAILURE TO TRAIN AND SUPERVISE ADMINISTRATIVE REMEDY PROCESSING (ORM)

Against: District of Columbia (Office of Risk Management)

Elements and Application

Element 1 – Inadequate training or procedures

ORM employees (Unknown,Stokes,) provided deficient denial letters stating a failure to timely file the admin remedy, giving only a boldened citing of the law as the deficiency to meet statutory requirements, but requirements were presented as met and no factual deficiency was stated to support the denial, Stokes then gave contradictory and false information denying the deficiency of the denial letter and contradictory and false information about ORM authority to process administrative claims against the courthouse. their supervisor Clark was repeatedly notified and failed to respond (¶61–67).

Element 2 – Deliberate indifference

An unknown ORM employee issued a denial letter citing untimeliness without factual explanation, after which Stokes' misinformation compounded the deprivation, ORM is the (alleged) central entity responsible for administrative tort claims, making the need for accurate guidance obvious(¶61–65).

Element 3 – Failure to supervise

ORM supervisor Peter Clark ignored repeated calls and emails notifying him of Stokes' statements and the resulting deprivation (¶66–67).

Element 4 – Causation

Plaintiff's claim was denied or impaired due to misinformation and delay/refusal (¶61–67).

**INDIVIDUAL-CAPACITY §1983 CLAIMS**

COUNT 7 – §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. V)

Against: Thomas Hedgepeth (individual capacity)

Elements and Application

Element 1 – State action under color of law

Hedgepeth was acting as courthouse security personnel exercising official authority when interacting with Plaintiff regarding the assault (¶25).

Element 2 – Obstructive act impairing access to courts

Hedgepeth refused to review available surveillance footage and refused to generate an incident report documenting the assault, despite Plaintiff's request and notice of injury (¶25–27).

40

Element 3 – Foreseeability of litigation triggering duty

An assault inside a courthouse, coupled with a request for documentation, made civil and criminal litigation reasonably foreseeable, triggering a duty to preserve evidence and document the incident (¶25–27).

Element 4 – Causation and actual injury

Hedgepeth's refusal initiated the chain of non-preservation that resulted in the permanent loss of surveillance footage, thereby foreclosing Plaintiff's ability to pursue judicial remedies (¶71–75).

COUNT 8 – §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. V)

Against: Adren Harris (individual capacity)

Elements and Application

Element 1 – State action under color of law

Harris acted as an attorney for the Office of the General Counsel for the District of Columbia when advising Plaintiff regarding evidence preservation obligations (¶42).

Element 2 – Affirmative interference with access to courts

Harris affirmatively stated that no duty to preserve surveillance footage existed absent a valid subpoena, providing a false legal standard governing preservation (¶42–45).

Element 3 – Knowledge of likely constitutional injury

Harris was informed that litigation was foreseeable and that surveillance footage faced imminent deletion, yet persisted in denying the preservation duty (¶42–45; ¶71–74).

Element 4 – Causation and actual injury

By providing incorrect legal guidance that prevented escalation or issuance of a litigation hold, Harris materially contributed to the destruction of evidence and Plaintiff's loss of access to the courts (¶71–75).

COUNT 9 – §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. V)

Against: Kia Darby and Unknown Executive Office Staffers (individual capacities)

Elements and Application

Element 1 – State action under color of law

Darby and the unknown staffers acted as Executive Office personnel responsible for receiving and routing complaints concerning courthouse operations (¶46).

Element 2 – Failure to act after notice of imminent harm

Plaintiff informed Executive Office personnel of Hedgepeth's refusal to document the assault, Harris's denial of the preservation duty, and the imminent risk of footage deletion (¶46–53).

Element 3 – Deliberate indifference to known risk

Despite this notice, Executive Office personnel ignored, terminated, or deflected Plaintiff's complaints without docketing, escalation, or intervention (¶46–51).

Element 4 – Causation and actual injury

The failure to supervise or intervene resulted in no preservation order being issued and the subsequent destruction of surveillance footage, impairing Plaintiff's judicial remedies (¶71–75).

COUNT 10 – §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. V)

Against: Janice Stokes (individual capacity)

Elements and Application

Element 1 – State action under color of law

Stokes acted as an employee of the Office of Risk Management when communicating with Plaintiff regarding the handling of his administrative tort claim (¶61).

Element 2 – Affirmative misinformation impairing protected interest

Stokes informed Plaintiff that ORM does not handle administrative tort claims arising from courthouse misconduct and that an ORM denial letter citing untimeliness was sufficient, despite Plaintiff's inquiries regarding deficiencies (¶61–65).

43

Element 3 – Knowledge of likely deprivation

Stokes was aware that Plaintiff relied on her statements to understand his available administrative remedies and that misinformation would impair Plaintiff's statutory entitlement to pursue a tort claim (¶61–67).

Element 4 – Causation and actual injury

As a result of Stokes's misinformation, Plaintiff's administrative remedy was foreclosed and his ability to seek judicial relief against the District was impaired (¶61–67).

COUNT 11 – §1983 SUPERVISORY LIABILITY; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. V)

Against: Peter Clark (individual capacity)

Elements and Application

Element 1 – Supervisory authority under color of law

Clark served as a supervisor within the Office of Risk Management with authority over Stokes and ORM claim processing (¶66).

Element 2 – Actual knowledge of subordinate misconduct

Plaintiff repeatedly notified Clark of Stokes's misinformation and the resulting impairment of his administrative remedy (¶66–67).

Element 3 – Deliberate indifference through inaction

Despite receiving notice, Clark failed to investigate, correct the misinformation, or provide guidance to ensure proper claim handling (¶66–67).

Element 4 – Causation and actual injury

Clark's failure to act allowed the deprivation caused by Stokes's misinformation to continue uncorrected, resulting in the loss of Plaintiff's administrative and judicial remedies (¶61–67).

COUNT 12 – §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. V)

Against: MPD Officer (Female, Unknown Name)

Elements and Application

Element 1 – State action under color of law

The MPD officer acted in her official capacity when receiving and classifying Plaintiff's assault report (¶33–36).

Element 2 – Obstructive act

She classified the assault as a non-crime without investigation or explanation (¶36–37).

Element 3 – Foreseeability

An assault report makes litigation and investigation foreseeable (¶33–36).

Element 4 – Causation and injury

The misclassification impaired Plaintiff's access to law-enforcement and judicial remedies (¶37–75).

COUNT 13 –  §1983 SUPERVISORY LIABILITY; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. V)

Against: MPD Supervisor (Unknown Name)

Elements and Application

Element 1 – Supervisory authority

The supervisor exercised authority over crime classification decisions (¶37–41).

Element 2 – Knowledge

The supervisor was notified of the improper classification and Plaintiff's objections (¶37–41).

Element 3 – Deliberate indifference

The supervisor refused to correct or explain the classification (¶37–41).

Element 4 – Causation and injury

Supervisory ratification caused continued denial of investigative and judicial remedies (¶37–75).

COUNT 14 – §1983 DENIAL OF ACCESS TO THE COURTS; PROCEDURAL DUE PROCESS (U.S. CONST. AMEND. V)

Against: Pedro (Office of the General Counsel employee, individual capacity)

Elements and Application

Element 1 – State action under color of law

Pedro acted as an employee of the District of Columbia Office of the General Counsel when communicating with Plaintiff regarding where and how to file an administrative tort claim arising from courthouse misconduct (¶54–60).

Element 2 – Protected property interest / access right

Plaintiff possessed a statutory entitlement to pursue an administrative tort remedy against the District as a prerequisite to judicial relief (¶54–60).

Element 3 – Affirmative interference with access to courts

Pedro affirmatively stated that the Office of the Attorney General accepted administrative tort claims against the D.C. courthouse, a statement that was false and misrepresented the proper administrative process (¶54–60).

Element 4 – Knowledge or obviousness of deprivation

As an OGC employee providing guidance on claim filing, Pedro knew or should have known that misdirecting Plaintiff to an entity that does not accept such claims would impair Plaintiff's ability to timely perfect administrative remedies (¶54–60).

Element 5 – Causation and actual injury

Plaintiff relied on Pedro's misinformation, resulting in delay, misfiling, and impairment of his administrative remedy, which in turn burdened and partially foreclosed Plaintiff's access to the courts (¶61–67).

//

//

//

//

//

COUNT — 15   42 U.S.C. § 1983 — DENIAL OF ACCESS TO THE COURTS (BACKWARD-LOOKING)

Fifth Amendment Due Process — Evidence Concealment / Spoliation

Against: District of Columbia; Thomas Hedgepeth; Adren Harris; Kia Darby; Willa Obel; Herbert Rouson; Pedro;

Elements and Application

Element 1 — Nonfrivolous underlying claim

Plaintiff incorporates ¶¶ 12–22, 25–27, and 33–36.

Plaintiff was physically assaulted inside the Moultrie Courthouse by a needle or sharp object, giving rise to viable civil and criminal claims, including battery, negligence, and constitutional claims against state actors or persons acting under color of law (¶¶ 12–22). Plaintiff promptly reported the assault and sought documentation and preservation (¶¶ 25–27; 33–36).

This underlying claim was nonfrivolous.

Element 2 — Official acts that obstructed access to the courts

Plaintiff incorporates ¶¶ 25–27, 42–53, 46–51, 54–60, and 70–75.

After receiving notice of the assault and foreseeable litigation:

Defendant Hedgepeth refused to review surveillance footage and refused to generate an incident report documenting the assault (¶¶ 25–27);

Defendant Harris affirmatively stated that no duty to preserve surveillance footage existed absent a subpoena, providing false legal guidance (¶¶ 42–45);

Defendants Darby, Obel, and Rouson, despite repeated notice of urgency, failed to escalate, override, or issue a preservation directive and ignored or terminated Plaintiff's complaints (¶¶ 46–53; 49–51);

Defendant Pedro provided false and misleading information regarding administrative remedies, contributing to delay and misdirection (¶¶ 54–60).

These acts and omissions occurred while Defendants exercised control over evidence critical to Plaintiff's claims (¶¶ 70–75).

Element 3 — Evidence uniquely within Defendants' control

Plaintiff incorporates ¶¶ 25–27, 42–53, 70–75.

The identity of the assailant and whether the assailant acted under color of law could only be determined through records exclusively controlled by Defendants, including:

through records exclusively controlled by Defendants, including:

-employee-only door access logs;

-badge, keycard, or credential records;

-employee schedules and access rosters;

-computer and system login records;

-surveillance footage and retention or deletion logs.

Plaintiff had no independent means to obtain this information (¶¶ 70–75).

Element 4 — Actual injury: foreclosure of judicial remedies

Plaintiff incorporates ¶¶ 71–75.

Because Defendants failed to preserve, review, or disclose this evidence, surveillance footage was lost or destroyed and identity-revealing access records were never produced. Plaintiff was thereby unable to identify the assailant, determine whether the attacker was a courthouse employee or contractor, or pursue meaningful civil or criminal remedies (¶¶ 71–75).

Element 5 — Causation

Plaintiff incorporates ¶¶ 25–27, 42–53, and 71–75.

Defendants' affirmative misinformation, refusal to act, and failure to preserve evidence were the direct and proximate cause of the destruction or concealment of

identity-revealing evidence and the resulting denial of Plaintiff's constitutional right of access to the courts.

COUNT  16 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367(a) because they arise from the same case or controversy as the federal claims.

Against: Attacker Defendant 1 (Unknown Attacker(s))

Elements and Application (D.C. Law)

Element 1 — Extreme and outrageous conduct

Plaintiff incorporates ¶¶ 12–22

An unknown individual intentionally punctured Plaintiff with a needle or sharp object inside a government courthouse. The act was inherently dangerous, invasive, and carried the implied threat of toxic exposure, disease transmission, or poisoning.

Such conduct exceeds all bounds of decency tolerated in a civilized society.

Element 2 — Intent or reckless disregard

52

The attacker acted intentionally or, at minimum, with reckless disregard for the probability of causing severe emotional distress by introducing an unknown substance into Plaintiff's body.

Element 3 — Severe emotional distress

Plaintiff incorporates ¶

Plaintiff experienced acute fear, distress, anxiety, and psychological trauma, including symptoms of intoxication believed to result from the puncture. Plaintiff was forced to make urgent decisions under distress, including foregoing medical treatment to pursue time-sensitive First Amendment activity.

Element 4 — Causation

The attacker's conduct was the direct and proximate cause of Plaintiff's severe emotional distress.

TORT CLAIMS – OF VICARIOUS AND INDIVIDUAL LIABILITY

Notice: All tort claims below are asserted against the District of Columbia under vicarious liability for acts within the scope of employment. In the alternative, where the District denies responsibility or contends an employee acted outside the scope of employment, the same torts are asserted against the individual defendants in their individual capacities.

Notice of service of Administrative remedy satisfaction of requirements: Plaintiff even though he was deprived an administrative claim remedy proccess, did provide the District of Columbia in its Executive office of the Moultrie Courthouse, Its Attorney generals civil Department and The Mayors Office Office of Risk Managment all with administrative remedy requests in the proper time mandated and the specific dates of submission and submissions and the response from ORM will be submitted as exhibits.

54

DEFENDANT 1 – THOMAS HEDGEPETH

Tort 1 – NEGLIGENCE / GROSS NEGLIGENCE

Elements and Application

Element 1 – Duty of care

Hedgepeth owed a ministerial duty as courthouse security to document assaults, review available surveillance footage, and initiate incident reporting procedures (¶25–27).

Element 2 – Breach of duty

Hedgepeth refused to review surveillance footage and refused to generate an incident report despite notice of an assault and injury (¶25–27).

Element 3 – Causation

Hedgepeth's refusal prevented initiation of preservation and investigative processes, contributing directly to the loss of surveillance evidence (¶71–75).

Element 4 – Damages

Plaintiff suffered loss of evidence and impairment of civil and criminal remedies (¶71–75).

DEFENDANT 2 – ADREN HARRIS

Tort 2 – NEGLIGENCE / GROSS NEGLIGENCE

Elements and Application

Element 1 – Duty of care

Harris owed a duty as OGC counsel to provide accurate legal guidance regarding evidence preservation and administrative procedures (¶42–45).

Element 2 – Breach of duty

Harris provided false legal guidance that preservation duties arise only upon receipt of a subpoena (¶42–45).

Element 3 – Causation

Plaintiff relied on Harris's statements, which prevented escalation and contributed to evidence destruction (¶71–75).

Element 4 – Damages

Loss of surveillance evidence and judicial remedies (¶71–75).

Tort 3 – FRAUD / FRAUDULENT MISREPRESENTATION

Elements and Application

Element 1 – False representation of material fact

Harris represented that no preservation duty existed absent a subpoena (¶42–45).

Element 2 – Knowledge or reckless disregard

As OGC counsel, Harris knew or recklessly disregarded that the statement was false (¶42–45).

Element 3 – Intent to induce reliance

The statement was made to direct Plaintiff's actions regarding preservation (¶42–45).

Element 4 – Justifiable reliance

Plaintiff relied on the representation in attempting to preserve evidence (¶42–45).

Element 5 – Damages

Reliance resulted in evidence loss and forfeiture of claims (¶71–75).

DEFENDANT 3 – MPD OFFICER (FEMALE, NAME UNKNOWN)

Tort 4 – NEGLIGENCE

Elements and Application

Element 1 – Duty of care

The MPD officer owed a duty to accurately classify reported crimes and initiate appropriate investigative procedures (¶33–36).

Element 2 – Breach of duty

The officer classified a reported assault as a non-crime without investigation or explanation (¶36–37).

Element 3 – Causation

The misclassification foreclosed investigation and evidence development (¶37–41).

Element 4 – Damages

Plaintiff lost access to law-enforcement remedies and supporting evidence (¶71–75).

DEFENDANT 4 – MPD SUPERVISOR (NAME UNKNOWN)

Tort 5 – NEGLIGENCE / NEGLIGENT SUPERVISION

Elements and Application

Element 1 – Supervisory duty

The supervisor owed a duty to review, correct, and supervise crime classifications made by subordinates (¶37–41).

Element 2 – Breach of duty

The supervisor refused to correct or explain the non-crime classification despite notice (¶37–41).

Element 3 – Causation

Supervisory inaction ratified the misclassification and prevented remediation (¶37–41).

Element 4 – Damages

Loss of investigative and judicial remedies (¶71–75).

DEFENDANT 5 – KIA DARBY

Tort 6 – NEGLIGENCE

Elements and Application

Element 1 – Duty of care

Darby owed a duty as Executive Office staff to receive, document, and escalate complaints involving imminent harm and evidence loss (¶46–53).

Element 2 – Breach of duty

Darby ignored, deflected, or failed to act upon Plaintiff's urgent complaints (¶46–51).

Element 3 – Causation

Failure to escalate prevented supervisory intervention and preservation (¶71–75).

Element 4 – Damages

Evidence loss and impairment of remedies (¶71–75)

DEFENDANT 6 – WILLA OBEL

Tort 7 – NEGLIGENCE / NEGLIGENT SUPERVISION

Elements and Application

Element 1 – Supervisory duty

Obel owed a duty to oversee complaint handling within the Executive Office (¶46–53).

Element 2 – Breach of duty

Obel failed to ensure complaints were documented or acted upon when transferred to her office (¶46–53).

Element 3 – Causation

The absence of supervisory action contributed to non-preservation and spoliation (¶71–75).

Element 4 – Damages

Loss of evidence and remedies (¶71–75).

DEFENDANT 7 – HERBERT ROUSON

Tort 8 – NEGLIGENT SUPERVISION / NEGLIGENT RETENTION

Elements and Application

Element 1 – Supervisory and retention duty

Rouson owed a duty to supervise and retain competent courthouse and administrative personnel (¶46–53).

Element 2 – Knowledge of unfitness

Rouson was on notice of systemic failures and complaints concerning subordinate misconduct (¶46–53).

Element 3 – Breach

No corrective supervision, training, or discipline occurred (¶46–53).

Element 4 – Causation

Failure to supervise and retain competent personnel resulted in continued constitutional and evidentiary harm (¶71–75)

DEFENDANT 8 – PEDRO (OGC EMPLOYEE)

Tort 9 – NEGLIGENCE

Elements and Application

Element 1 – Duty of care

Pedro owed a duty to provide accurate information regarding administrative claim acceptance and procedures (¶54–60).

Element 2 – Breach of duty

Pedro falsely stated that the Attorney General accepted administrative claims against the courthouse (¶54–60).

Element 3 – Causation

Plaintiff relied on the misinformation, causing delay and procedural impairment (¶61–67).

Element 4 – Damages

Loss of timely administrative remedy and related judicial claims (¶61–75).

DAMAGES AND RELIEF

As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered:

-Exposure to an unknown substance and disease via needle puncture and the resulting fear of latent injury;

-Severe emotional distress and psychological harm;

-Loss of opportunity to timely petition government officials during a critical federal transition;

-Impairment of Plaintiff's ability to pursue civil and criminal remedies due to evidence destruction;

-Ongoing uncertainty caused by Defendants' ongoing refusal to identify the assailant.

Plaintiff seeks:

Compensatory damages in an amount to be determined at trial, but in no event less than $2,000,000.00 from District of Columbia; and asks with consideration, in the amounts of $200,000.00 from THOMAS HEDGEPETH; $200,000.00 from ADREN HARRIS; $85,000.00 from KIA DARBY $29,000.00 from EX 1 Unknown; $29,000.00 from EX 2 Unknown, $100,000.00 from  Ex Unknown 3; $35,000.00 Willa Obel; $85,000.00 from Pedro; $65,000.00 from  Janice Stokes $15,000.00 from Unknown ORM staffer; $29,000.00 from Peter Clark with punitive damages where permitted by law."

Declaratory relief that Defendants violated Plaintiff's constitutional rights AND  a notice in a full page news article; Costs and fees related to litigation and any other awards as the Court deems just and proper.

SUBMITTED BY          NICHOLAS WOODALL     2/14/2026

64